

U.S. Department of Justice

United States Attorney
Eastern District of New York

AB:TAD
F. #2013R00283

271 Cadman Plaza East
Brooklyn, New York 11201

October 2, 2015

By Hand and ECF

Honorable Raymond J. Dearie
Senior United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Fausto Bonifaz, 14-CR-575 (RJD)

Dear Judge Dearie:

      The government submits this letter in connection with sentencing, which is scheduled to take place on October 9, 2015 at noon. On March 17, 2015, the defendant, Fausto Bonifaz, pled guilty before the Honorable Steven M. Gold, Chief Magistrate Judge, to Count One of the above-captioned indictment, charging him with Coercion and Enticement of a Minor to Engage in Illegal Sexual Activity, in violation of 18 U.S.C. § 2422(b). On September 3, 2015, the Probation Department issued a Pre-Sentence Investigation Report ("PSR") calculating the defendant's Sentencing Guidelines range to be 121 to 151 months. As explained in more detail below, the Government's Guidelines calculation differs from the PSR, as reflected in the defendant's plea agreement. The Government's Guidelines calculation results in a total adjusted offense level of 34 (as opposed to Probation's calculation of 32), which corresponds to a range of imprisonment of 151 to 188 months. For the reasons explained below, the Government submits that a sentence within the Guidelines range of 151 to 188 months would be sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

I.    Factual Background

      The defendant, Fausto Bonifaz, was charged with coercing and enticing three minors to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b) and sexually abusing the same three minors, in violation of 18 U.S.C. § 2243(a). On March 17, 2015, he pled guilty to Count One of the Indictment, charging a violation of 18 U.S.C. § 2422(b). Due to the ages of the victims and the nature of the sexual abuse they endured, they are referred to herein as "Jane Doe 1," "Jane Doe 2," and "Jane Doe 3."

      A.     Jane Doe 1

      In 2008, the defendant worked with Jane Doe 1's mother at a department store in Brooklyn. See Detention Letter dated October 30, 2014, Docket No. 2 ("Detention Letter"). Jane Doe 1 was 11 years old at the time. She, her mother, and two younger siblings lived at the Fort Hamilton Army Base in Brooklyn, New York, which is within the special maritime and territorial jurisdiction of the United States. Id.; PSR ¶ 2. At the time, Jane Doe 1's father was deployed overseas. PSR ¶ 2. The defendant became close friends with Jane Doe 1's mother, who was struggling to care for three children by herself. Detention Letter, p. 2. Eventually, Jane Doe 1's mother trusted the defendant enough to leave him alone with her children while she did errands, and he volunteered to babysit them. Detention Letter, p. 2. The defendant would spend the night at Jane Doe 1's house approximately 1-2 times per week. PSR ¶ 2.

      The defendant first became sexually inappropriate with Jane Doe 1 between December 2009 and February 2010, when Jane Doe 1 was 12 years old. PSR ¶ 3. He made comments about Jane Doe 1's breasts. Id. In late 2009 to early 2010 when Jane Doe 1 was 12 years old, the defendant convinced Jane Doe 1 to let him touch her breasts. He repeatedly asked her to touch his penis, and showed her how to masturbate him. Detention Letter, p. 2. Her mother was unaware of what was going on, as the events either occurred at night, when the mother was asleep, or when the mother was at work and the defendant was babysitting Jane Doe 1 and her younger siblings. Id.

      From early 2010 to the fall of 2010, when Jane Doe 1 was 12 years old, the defendant sexually abused Jane Doe 1 in the following ways: he performed oral sex on her, he had her perform oral sex on him, he digitally penetrated her vagina, and he had her masturbate him. Detention Letter, p. 2; PSR ¶¶ 4-5. The defendant also had sexual intercourse with Jane Doe 1, telling her "it wouldn't hurt." PSR ¶ 5. Jane Doe 1 tried to squirm away from the defendant while they were having sexual intercourse for the first time. She noticed "gooey stuff" on the defendant's penis afterwards. Id. Jane Doe 1 had never had sex before her encounter with the defendant. The defendant repeatedly told Jane Doe 1 that he would go to jail if she told anyone. Detention Letter, p. 2. Jane Doe 1 did not disclose the defendant's abuse until years later when she informed a school counselor. Id.

      Jane Doe 1 and her mother submitted victim impact statements to the Court. In her letter, Jane Doe 1 described the emotional impact of the defendant's actions on her. Addressing the defendant directly, she stated:

> The things that you did to me are forever going to be engraved in my past, and I hate you for that. Almost every single night I would cry, think lowly of myself, and always feel guilty. As if it was my fault. I still feel guilty. For not taken the chance to speak out earlier. Constantly I would have nightmares. I would be anxious whenever I saw and/or heard about you. You- knew that I didn't have the best of

2

> friends, and that I was quiet, insecure, and very naive- took advantage of that. At first, I saw you as a friend, a role model, and somebody to talk to. But you didn't care about any of that. You just saw me as someone to play around with and hurt. You took something that was very precious to me, and that I will never get back. I will never forgive you for that. I was only twelve years old. A twelve year old shouldn't be suffering from suicidal thoughts, anxiety, or depression. Instead of spending my time worrying about what game I should play, I was too focused about how ugly I am. You took my trust and crushed it.

Jane Doe 1 Victim Impact Statement.

Jane Doe 1's mother also submitted a victim impact statement, in which she explained her unyielding sense of guilt for not protecting her daughter from the defendant:

> On her thirteenth birthday my daughter wrote a suicide note, instead of having fun with her friends and family. For more than two years she had nightmares, insomnia and was literally miserable, it wasn't until we found out what had happen to her that we put two in two together. Though what Mr. Bonifaz did to my daughter affect my whole family, the person that pay the biggest price is [Jane Doe 1]. She would barely smile, even in her pictures going back to that period of time she looks gloomed, and lifeless. We were never able to understand what was wrong with her. It took two psychiatrists and a lot of work to get [Jane Doe 1] to where she is now. To tell the truth [Jane Doe 1] was not the only one thought about ending her life, after finding out what he had done to her, I could not face myself or my family and most of all [Jane Doe 1], as her mother it was my job to protect her and I had failed her so I also thought about ending my life. The only thing that stopped me was my children and knowing, it would have giving victory to Mr. Bonifaz and I was not about to let that happen.

Jane Doe 1's Mother's Victim Impact Statement.

B.   Jane Doe 2

Jane Doe 2 was a close friend of Jane Doe 1, and she also lived at the Fort Hamilton Army base between 2009 and 2010.  Detention Letter, p. 3; PSR ¶ 8.  At the time, Jane Doe 2 was 13 years old and was in the 7th grade.  PSR ¶ 8.  She believed the defendant was a "cool guy," as he took her and Jane Doe 1 places and purchased things for them.  PSR ¶ 9.

A few months after meeting the defendant, Jane Doe 2 saw the defendant kissing Jane Doe 1.  PSR ¶ 10.   The three of them would speak about sex.  Jane Doe 2 told the defendant that she had previously engaged in sexual intercourse, and the defendant tried

3

to convince her to have sex with him.  Id.  Jane Doe 2 and the defendant spoke on the telephone on one occasion about oral sex.  Id.

On multiple occasions, the defendant digitally penetrated Jane Doe 2's vagina at Jane Doe 1's apartment.  He also performed oral sex on Jane Doe 2.  PSR ¶ 11.  The defendant attempted to have sexual intercourse with Jane Doe 2, but she refused.  PSR ¶ 12.  After that incident, the defendant started acting "funny" towards Jane Doe 2.  Id.  He told Jane Doe 1's mother that Jane Doe 2 was a bad influence on Jane Doe 1.  Id.  Jane Doe 1's mother then refused to allow Jane Doe 2 to come to their residence.

  C. Jane Doe 3

Jane Doe 3 was friends with Jane Doe 1 and Jane Doe 2.  PSR ¶ 13.  During the winter or spring of 2010, when Jane Doe 3 was 12 years old,[1] Jane Doe 2 telephoned Jane Doe 3 and asked if she wanted to go to Jane Doe 1's house.  Following the conversation, the defendant and Jane Doe 2 picked up Jane Doe 3 in the defendant's car near a basketball court in Brooklyn.  PSR ¶ 13.  The group then stopped at a Redbox vending machine to pick up a cartoon movie for Jane Doe 1's younger siblings to watch.  Id.  The defendant drove Jane Doe 2 and Jane Doe 3 to Jane Doe 1's house.  Id.

At the home, the defendant and the three girls went into Jane Doe 1's mother's bedroom.  PSR ¶ 14.  Jane Doe 1's mother was not home; the defendant was supposed to be babysitting Jane Doe 1 and her younger siblings.[2]  Jane Doe 1's younger siblings were left watching the rented cartoon in the living room.  Id.  In the bedroom, Jane Doe 1 and Jane Doe 2 were kissing before any incident happened with the defendant.  Id.  Then Jane Doe 1 was on the bed, and the defendant was lying on top of her, kissing her.  Id.  The defendant then took off Jane Doe 3's pants and underwear and digitally penetrated her.  Id.  Jane Doe 3 described a burning feeling in her vaginal area.  Id.  The defendant then took off his pants (but kept on his underwear) and performed oral sex on Jane Doe 3.  PSR ¶ 14.   The defendant stopped after Jane Doe 3 moved his head.  Jane Doe 3 then got up from the bed and put her clothes back on.  Id.  When recounting this incident to the investigating agents, Jane Doe 3 remarked that Jane Doe 1 and Jane Doe 2 acted like the incident was normal.  Id.  Later that night, the defendant drove Jane Doe 3 to her basketball practice.  Before Jane Doe 3 exited the car, he touched her leg by reaching back and said: "you were yummy."  PSR ¶ 15.

Jane Doe 3 submitted a victim impact describing the emotional trauma she has suffered as a result of the defendant's actions.  She stated:

---

[1] The PSR incorrectly states that Jane Doe 3 was 13 when she met the defendant; Jane Doe 3 was 12 at all relevant times.

[2] The Government asks that the PSR be amended to reflect that Jane Doe 1's mother was not home on the date of this incident.

4

It is very hard for me to write about this traumatic situation as I start to think back on all the affects it had on me. As a child I was very outgoing and athletic I loved hanging out with friends and doing things that a child would do at the age of 12. After that day I promised myself I would never tell a soul about what happened in the bedroom because I felt like it was my fault and that I deserved what you did to me.

This crime has affected me greatly and as I didn't want to accept that before now I understand. I thought I got away from the situation but as I sit here writing this statement I remember all the small things that changed about me. For example, my high school years I never wanted to be around adult men I was angry all the time I hated myself. I blamed myself every day for about 5 years wondering why. I thought maybe it was my fault maybe my clothes were too tight so I started to dress differently, now everything that I wear is a size too big because the comfort of knowing that a man cannot see the shape of my body is everything. I think to myself if he can't see my body he cannot and will not touch me. I did anything to mask the way I looked throughout my high school years to keep any unwanted attention off of me. In high school people didn't understand why I dressed like that so they would call me "[REDACTED]" instead of [Jane Doe 3] and ask me questions such as "why are you such a tomboy?" or "why do you dress that way?" Because of you I had to deal with self-hate and bullying from other kids because they did not understand the traumatic events in my life and also again I swore to myself I wouldn't tell anyone. The crime you committed towards me made me lose myself as a person I forgot who I was. I was afraid to be pretty I was afraid to be noticed I was afraid of males. You took away my innocence everything that I stood for, you took away my life before it even began.

. . .

Although there may be no physical injuries apparent they are there. The injuries are in my heart and in my relationships with people. My injuries from the incident became most visible when a boy would try to hug me and I would start to shake and my heart would race, something so easy as greeting someone became a difficult task for me. All my friends were turning 16 and that's the age that it was ok to date a boy with my mother's permission but for me it didn't matter because I wanted nothing to do with boys. I thought to myself if I stayed out of sketchy situations a male could not take my innocence again.

Fausto I hope one day you sit and realize that day three little girls walked in that bedroom more alive than ever and when we all walked

> out a piece of us died in that room. You may or may not have kids but if so could you imagine the acts being done to your own flesh and blood? I'm in college now playing basketball and each day gets easier but I hope all the time you spend in jail is spent thinking about all the years you took away from me.

Jane Doe 3 Victim Impact Statement.

### D.   The Defendant's Confession

In late July 2014, FBI agents interviewed the defendant at his apartment in Queens.  PSR ¶ 16.  The defendant admitted he knew Jane Doe 1 and her mother, and he often went to Jane Doe 1's house.  PSR ¶¶ 16-17.  The defendant stated that he became a "father figure" to Jane Doe 1.  PSR ¶ 17.  He said that he sometimes cuddled with Jane Doe1, which eventually led to kissing.  Id.  He admitted to performing oral sex on Jane Doe 1 and having her perform oral sex on him.  Id.  The defendant also admitted to digitally penetrating Jane Doe 1.  Id.  He admitted that the sexual encounters with Jane Doe 1 all occurred at the Fort Hamilton Army base and that he believed Jane Doe 1 to be approximately 14 years old at the time.  The defendant denied having sexual intercourse with Jane Doe 1; he claimed she wanted to, but he did not want to proceed further.  PSR ¶ 17.

The defendant admitted that on one occasion, two of Jane Doe 1's female friends came over to her house.  The defendant denied having sexual contact with the two female friends, but he said that they were engaged on sexual behavior with each other, and he watched them while kissing Jane Doe 1.  PSR ¶ 18.  The defendant said that he maintained a relationship with Jane Doe 1 and her mother for approximately one year, until Jane Doe 1's father returned from his deployment.  PSR ¶ 18.

The defendant agreed to sign a written statement memorializing what he had told the agents.  PSR ¶ 21.  The statement reads as follows:

> I, Fausto Bonifaz, DOB [redacted] 1975, reside at [XXXXXXXX],  I give the following statement voluntarily and no threats or promises were made towards me.
>
> I have never forcibly sexually assaulted a minor.  I met [Jane Doe 1] about 7 years ago.  I met her through her mother, we both worked at Kohl's.  [Jane Doe 1] and her mother lived in an apt on Ft. Hamilton in Brooklyn, NY.  [Jane Doe 1] and I engaged in oral sex several occasions at [Jane Doe 1]'s apt.  I also digitally penetrated [Jane Doe 1] and she "jerked" me off.  [Jane Doe 1] was about 14 years old at the time.

6

> On one occasion, two of [Jane Doe 1]'s friends were engaged in sexual activity and I watched and just kissed [Jane Doe 1]. I did not engage in any sexual activity with any of the other girls.
>
> My physical relationship with [Jane Doe 1] lasts a few months. After [Jane Doe 1]'s father came back, [Jane Doe 1] and I only communicated via txt and email for a month. My cell phone number is 917-xxx-2587.

PSR ¶ 21.

### E.  The Defendant's Statements on the Date of His Arrest

FBI agents arrested the defendant on October 30, 2014. PSR ¶ 22. After being informed of his Miranda rights, the defendant invoked his right to silence and indicated he had an attorney. Detention Letter, p. 5. While being driven to the Eastern District of New York for processing, the defendant spontaneously asked the investigating agents how much time he was facing. Id. One of the agents stated: "10 to 20[3] on the one charge and 0 to 15 on the other." The defendant said: "I can't believe they have these sentences for what happened." The agent responded: "you sexually abused two 12 year olds and a 13 year old." The defendant then said, in sum and substance: "in our society, not all 12-year-olds are the same." The agent asked: "are you saying it's okay to [have sex with] some 12-year-olds and not others?" The defendant did not answer.

A few minutes later, during which no additional conversation had occurred, the defendant said: "I don't think [Jane Doe 1] would say anything, but one of those other girls is trouble." The case agent stated: "this wasn't an isolated incident, it happened over a period of time." The defendant then responded: "with the two girls, it only happened once."[4] Detention Letter, p. 5.

## II.  The Guidelines Calculation

As reflected in the plea agreement, the adjusted total offense level is 34, which is calculated as follows:[5]

---

[3]  In fact, the defendant faces 10 years to life.

[4]  The Government requests that the PSR be amended to include the defendant's October 30, 2014 conversation with the investigating agents. This conversation was memorialized in an investigative report that was disclosed to Probation, and it demonstrates the defendant's lack of remorse and his continuing tendency to rationalize his behavior.

[5]  The government has informed Probation of the discrepancy between the Guidelines calculation in the PSR and the plea agreement. The Government understands that

The base offense level is 28, pursuant to U.S.S.G. § 2G1.3(c)(3). Two points are added because Jane Doe 1 was in the custody, care or supervisory control of the defendant because he was babysitting her and her younger siblings. See U.S.S.G. § 2G1.3(b)(1). An additional two points are added because the defendant unduly influenced Jane Doe 1 to engage in prohibited sexual contact. See 2G1.3(b)(2) and Application Note to 2G1.3(b)(2)(B) ("In a case in which a participant is at least 10 years older than the minor, there shall be a rebuttable presumption that subsection (b)(2)(B) applies. In such a case, some degree of undue influence can be presumed because of the substantial difference in age between the participant and the minor."). Two more points are added because the offense involved the commission of a sex act or sexual contact. See U.S.S.G. § 2G1.3(b)(4). This results in a total offense level of 34 (28 + 2 + 2 + 2 = 34). Pursuant to § 2G1.3(d)(1), multiple count analysis shall be applied as though each victim were in a separate count of conviction. The same base offense level and enhancements apply to Jane Doe 2 and Jane Doe 3 because at the time of the incident involving the three victims, the defendant was acting as Jane Doe 1's babysitter and was the only adult present at the house. Pursuant to the grouping analysis set forth in U.S.S.G. §§ 3D1.2, comment n.8 and 3D1.4, three points are added, resulting in a total offense level of 37. Because the defendant accepted responsibility by pleading guilty on March 17, 2014, three points are subtracted, resulting in an adjusted total offense level of 34. The defendant falls within Criminal History Category I. The corresponding range of imprisonment is 151-188 months' imprisonment.

III.   The Defendant's Objections to the PSR

The defendant objects to paragraph 5 of the PSR because he claims he did not have sex with Jane Doe 1. See PSR objection letter dated September 23, 2015. The Government disagrees. Jane Doe 1 was interviewed on numerous occasions, and she has consistently stated that she and the defendant had sexual intercourse at least six times. The defendant also objects to the portions of paragraphs 4, 11, 12, 14 and 15 of the PSR that refer to him engaging in sexual activity with Jane Doe 2 and Jane Doe 3. Again, the government disagrees. Jane Doe 2 and Jane Doe 3 were interviewed repeatedly, and both described the same incident with the defendant that occurred in Jane Doe 1's mother's room. Furthermore, on the day of his arrest, the defendant stated: "I don't think [Jane Doe 1] would say anything, but one of those other girls is trouble," and "with the two girls, it only happened once." Detention Letter, p. 5. This admission contradicts the defendant's contention that he never engaged in sexual activity with Jane Doe 2 and Jane Doe 3.

A. Legal Standard

In the Second Circuit, a sentencing court's discretion is "largely unlimited either as to the kind of information it may consider, or the source from which it may come." United States v. Sisti, 91 F.3d 305, 312 (2d Cir. 1996). In connection with sentencing, the

---

Probation will be submitting an addendum to the PSR correcting the Guidelines calculation in the near future.

8

Court may consider, inter alia, uncharged conduct, acquitted conduct, and previously considered conduct.  This has been the law since the outset of sentencing under the United States Sentencing Guidelines.  See, e.g., United States v. Rodriguez-Gonzalez, 899 F.2d 177, 182 (2d Cir. 1992) (sentencing court considered evidence that defendant used and carried a firearm during offense even though defendant had been acquitted of firearms charge); United States v. Watts, 519 U.S. 148, 154 (1997) (holding that lower evidentiary standard at sentencing permits sentencing court's consideration of acquitted conduct); Witte v. United States, 515 U.S. 389, 399-401 (1995) (noting that sentencing courts have traditionally considered wide range of information without the procedural protections of a criminal trial, including information concerning criminal conduct that may be the subject of a subsequent prosecution); Nichols v. United States, 511 U.S. 738, 747-48 (1994) (noting that district courts have traditionally considered a defendant's prior criminal conduct even when the conduct did not result in a conviction).

"[D]isputed facts relevant to sentencing . . . need to be established only by a preponderance of the evidence." United States v. Concepcion, 938 F.2d 369, 388 (2d Cir. 1992) cert denied, 510 U.S. 856 (1993). In fact, any information may be considered at a Fatico hearing, so long as it has sufficient indicia of reliability to support its probable accuracy.  Watts, 519 U.S. at 157; Nichols, 511 U.S. at 748.  This is a significantly lower evidentiary standard than the "beyond a reasonable doubt" standard required for conviction.  Due process rights are not violated where the sentencing court relies on information outside of the charged offense or that is derived from other proceedings so long as the defendant "ha[s] an opportunity to respond in order that the court not rely on misinformation." Concepcion, 983 F.2d at 387-88.  For example, in United States v. Tracy, 12 F.3d 1186, 1203 (2d Cir. 1993), the Second Circuit upheld the sentencing court's use of evidence presented at a related trial.  Similarly, in United States v. Carmona, 873 F.2d 569, 574 (2d Cir. 1989), the Second Circuit upheld the sentencing court's use of testimony from a trial in which the person sentenced was not a defendant.  A wide breadth of factual information can and should be considered at sentencing.

Additionally, the Second Circuit has long upheld a permissive evidentiary standard in connection with proof of facts at sentencing.  In resolving factual disputes at sentencing, the court is free to consider hearsay evidence both in testimony and written affidavits.  See United States v. Martinez, 413 F.3d 239, 243-44 (2d Cir. 2005).  See also Sisti, 91 F. 3d at 312 ("The sentencing court's discretion is largely unlimited either as to the kind of information it may consider, or the source from which it may come.") (internal quotes omitted, alteration in Sisti); U.S.S.G. § 6A1.3, comment ("Written statements of counsel or affidavits of witnesses may be adequate under many circumstances."); see also Williams v. New York, 337 U.S. 241, 247 (1949) (sentencing judges should not be denied information pertinent to sentence by rigid adherence to rules of evidence); Fed. R. Evid. 1101(d) ("These rules . . . do not apply to miscellaneous proceedings such as . . . sentencing.").

B. The Challenged Paragraphs Should Remain in the PSR

The challenged paragraphs should remain in the PSR because the veracity of the statements is proven by a preponderance of the evidence. To the extent the defendant seeks to challenge the Guidelines calculation based on the multiple victim analysis, the Government will present the testimony of the investigating agent who interviewed the three victims at a Fatico hearing. See Martinez, 413 F.3d at 244 (holding that investigating detective's hearsay testimony at sentencing about his interviews of witnesses was appropriate and did not violate the defendant's Sixth Amendment rights). In addition, the Government will submit to the Court the videotaped forensic interviews of Jane Doe 1 and Jane Doe 2.[6]

III. Sentencing

A. Legal Standard

The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 543 U.S. 220, 258-60 (2005). In Booker, the Supreme Court held that sentencing courts must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted) (emphasis added). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. Title 18, United States Code, Section 3553(a) provides in pertinent part:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set for in paragraph (2) of this section. The court, in determining the particular sentence to be imposed, shall consider:
>
> (1) the nature and circumstances of the offense . . . ;
>
> (2) the need for the sentenced imposed --

---

[6] The videotaped forensic interviews will be delivered to the Court under seal on Monday, October 5, 2015. A copy of the videotaped interviews will be available for defense counsel to review.

      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B) to afford adequate deterrence to criminal conduct;

      (C) to protect the public from further crimes of the defendant;

      (D) to provide the defendant with needed educational or vocational training; medical care, or other corrections treatment in the most effective manner; . . . .

    B.    <u>A Guidelines Sentence is Just</u>

The defendant sexually abused three 12- and 13-year-old girls over the course of many months. Far from being an isolated incident, the defendant repeatedly preyed on young and vulnerable girls to sexually gratify himself. For these reasons, a sentence within the Guidelines range of 151 to 188 months is sufficient, but not greater than necessary, to comply with the directives set forth in 18 U.S.C. § 3553(a). The Government also requests lifetime supervised release and restitution in the amount of Jane Doe 1's mental health treatment to date in addition to any projected mental health treatment.

      i.    Nature and Seriousness of the Offense

There can be no doubt that the defendant's criminal offense is extremely serious and demands a stringent sentence. The defendant was approximately 35 years old when he took advantage of three young, vulnerable, 12- and 13-year-old girls. As the defendant admits in his sentencing submission, he first "became involved with a co-worker of his . . . who had a young daughter." Defendant's Sentencing Letter, dated September 25, 2015, Docket No. 20, p. 2 ("Def. Ltr."). This "co-worker" was Jane Doe 1's mother. The defendant "was responsible for watching [Jane Doe I] from time to time." <u>Id.</u> Instead of behaving like a responsible adult, the way babysitters are expected to, the defendant sexually abused Jane Doe 1 and two of her friends. The defendant admits the repeated nature of his conduct. In his sentencing letter, he states that he "engaged in sexual acts with [Jane Doe 1] numerous times over the course of several months." <u>Id.</u>

As a result of the defendant's actions, Jane Doe 1 had suicidal thoughts, repeated nightmares, thought lowly of herself, and perversely, "always fe[lt] guilty." Jane Doe 1 Victim Impact Statement. Jane Doe 1's mother found suicide note on her daughter's thirteenth birthday: "On her thirteenth birthday my daughter wrote a suicide note, instead of having fun with her friends and family." Jane Doe 1's Mother's Victim Impact Statement.

After her encounter with the defendant, Jane Doe 3 "never wanted to be around adult men I was angry all the time I hated myself." She described dressing in loose clothing "because the comfort of knowing that a man cannot see the shape of my body is everything. I think to myself if he can't see my body he cannot and will not touch me." Jane Doe 3 Victim Impact Statement.

11

The defendant repeatedly committed hands-on sexual abuse of three minor girls. While he attempts to minimize his conducts as a "mistake," there was no mistake about what he did. The defendant built a relationship of trust with Jane Doe 1's mother, ingratiated himself into their family to the point where he was left alone with Jane Doe 1, her younger siblings, and her friends, and used his position of trust to sexually molest three young girls. A Guidelines sentence is necessary to reflect the seriousness of the defendant's offense.

### ii.  Promoting Respect for the Law and Providing Just Punishment

Pursuant to 18 U.S.C. § 3553, the Court should promote respect for the law and provide just punishment to a defendant in determining an appropriate sentence. This factor is known as the "just deserts" concept, answering the need for retribution so that the punishment fits the crime and the defendant is punished justly. See United States v. Irey, 612 F.3d 1160, 1206 (11th Cir. 2010). The Irey court cited the Senate Report regarding this provision:

> This purpose--essentially the "just deserts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

Id.

Because the "punishment should fit the crime, the more serious the criminal conduct is, the greater the need for retribution and the longer the sentence should be. The seriousness of the crime varies directly with the harm it causes or threatens. It follows that the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime." Id. This is especially true here because "child sex crimes are among the most egregious and despicable of societal and criminal offenses." Id.

The seriousness of this offense cannot be overstated. The defendant has caused devastating emotional consequences for the three minor victims in this case, as well as for their families. For these reasons, the Court should impose a sentence between 151 to 188 months, followed by lifetime supervised release and restitution.

### iii.  Providing Adequate Deterrence and Protecting the Public from Further Crimes of the Defendant

A Guidelines sentence also is necessary to provide adequate deterrence and to protect the public from further crimes of the defendant. As the Supreme Court noted in United States v. Kebodeaux, 133 S. Ct. 2496 (2013), "There is evidence that recidivism rates

among sex offenders are higher than the average for other types of criminals." (quoting Dept. of Justice, Bureau of Justice Statistics, P. Langan, E. Schmitt, & M. Durose, Recidivism of Sex Offenders Released in 1994, p. 1 (Nov. 2003) (reporting that compared to non-sex offenders, released sex offenders were four times more likely to be rearrested for a sex crime, and that within the first three years following release 5.3% of released sex offenders were rearrested for a sex crime)).

While the defendant claims that he "is very unlikely to reoffend," Def. Ltr., p. 7, this assertion flies in the face of his actual conduct. The defendant did not sexually abuse Jane Doe 1 one time, two times, or even three times. He "engaged in sexual acts with [Jane Doe 1] numerous times over the course of several months." Id. at 2. The defendant did not stop with Jane Doe 1; he sexually abused Jane Doe 2 and Jane Doe 3 as soon as he had the opportunity.

The defendant's comment on the day of his arrest to FBI agents suggests a high likelihood of recidivism. After he was arrested, the defendant stated: "in our society, not all 12-year-olds are the same." Apparently, the defendant believes it is okay to sexually abuse some 12-year-old girls, but not others. This statement reflects the defendant's utter lack of remorse for his actions and suggests that he will reoffend. To provide adequate deterrence and protect the public from further crimes of the defendant, a Guidelines sentence is necessary. In addition, the government requests lifetime supervised release and restitution for Jane Doe 1.

iv. The Need to Avoid Unwarranted Sentencing Disparities

The need to avoid unwarranted sentencing disparities also weighs in favor of a Guidelines sentence. In United States v. Shaffer, No. 12-CR-430, Judge Ross recently sentenced a defendant who was found guilty after trial of violating the same statute at issue here to 25 years' imprisonment, to be followed by lifetime supervised release. Notably, Shaffer involved a single 15-year-old victim. Here, there were three victims, ages 12 and 13.

13

To avoid unwarranted sentencing disparities among similarly situated defendants, the Court should impose a Guidelines sentence followed by lifetime supervised release and restitution.

IV.   Conclusion

For the reasons set forth above, the Court should impose a Guidelines sentence of 151 to 188 months, followed by lifetime supervised release and restitution.

Respectfully submitted,

KELLY T. CURRIE
Acting United States Attorney

By:     /s/   Tiana A. Demas
Tiana A. Demas
Assistant U.S. Attorney
(718) 254-6116

cc:   Clerk of the Court (RJD) (by ECF and Interoffice Mail)
      Jeffery Greco, Esq. (by ECF)